**UNITED STATES of America**

v.

**Daniel Pernell BLOUNT
and Joseph Torok.**

**Criminal Nos. 95–00073–03, 95–00073–04.**

United States District Court,
E.D. Pennsylvania.

Jan. 8, 1996.

---

Barbara H. Miller, Asst. U.S. Atty., Philadelphia, PA, for the Government.

Richard L. Caplan, Paoli, PA, for defendant Blount and Michael E. Moyer, Allentown, PA, for defendant Torok.

### MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

The present memorandum addresses issues arising during sentencing of Corrections Officers Torok and Blount for their role in a large conspiracy headed by inmate Charles Pernell Riddick to bring in and distribute drugs inside the former and new facilities of Lehigh County Prison, Allentown, Pennsylvania. A total of eight persons were charged in the overall conspiracy.[1] Of primary concern throughout several hearings has been the drug quantities attributable to Defendants Officer Torok and Officer Blount. We have also addressed drug distribution activity in proximity to a school; possible downward adjustment for acceptance of responsibility; enhancement for obstruction of justice; average drug quantity brought into the prison per day by the conspiracy; and Defendants' time involved in the conspiracy.

We received guilty pleas from Officers Joseph Torok and Daniel Blount on May 8, 1995, immediately before their jury trial was scheduled to begin.[2] Some seven months after his plea of guilty, Officer Blount sought to withdraw his guilty plea pursuant to Federal Rule of Criminal Procedure 32(e). We also address our denial of his motion in detail below.

The jury trial of Charles Pernell Riddick Sr. et al occurred before us from May 16,

---

1. The defendants in this case were Charles Pernell Riddick Sr., Charles Pernell Riddick Jr., Daniel Pernell Blount (a/k/a "Pipe"), Joseph Torok, Douglas Krause, Ronald Watts (a/k/a "Michael Phillips"), Theresa Cordero and Shannon Sicher.

2. Defendant Joseph Torok pleaded guilty to Criminal Indictment Number 95–73–04 consisting of Count 1, charging him with conspiracy to distribute cocaine and marijuana; count 8, charging him with the distribution of cocaine

near a school and aiding and abetting; and Count 9, charging him with distribution of marijuana and aiding and abetting. Defendant Blount pleaded guilty to the same indictment, consisting of Count 1, charging him with conspiracy to distribution of cocaine and marijuana; Count 12, charging him with the distribution of marijuana near a school, aiding and abetting; and Count 13, with the distribution of marijuana and aiding and abetting.

1995 to May 24, 1995. With the exception of the acquittal of one peripheral defendant, all defendants who went to trial were found guilty of conspiring to bring drugs into Lehigh County Prison. The government relied upon the testimony of several witnesses and a number of wiretaps. The remaining defendants in the conspiracy all entered pleas of guilty prior to trial.

At a sentencing hearing on August 23, 1995 we heard testimony and argument regarding the proximity of the drug transactions to school property. We ruled that the distribution of drugs did take place within 1000 feet of a school as noted in the presentence report. Additionally Defendants Officer Torok and Officer Blount at that time conceded their abuse of a position of trust and the two point enhancement it entails. The government wished to rely upon the extensive trial testimony to establish the quantities of drugs which were attributable to each defendant. At the request of the defense, we granted a continuance to allow the defense to review the trial testimony and cross-examine the trial witnesses at a later sentencing hearing.

At a further sentencing hearing on November 30, 1995 we heard testimony to determine the quantity of drugs that the defendants were involved with during the conspiracy. We reaffirmed our prior ruling relating to distribution within 1000 feet of a school and ruled that the defendant should receive a two level increase and no downward adjustment for acceptance of responsibility. We further found that Defendant Officer Torok had perjured himself at an earlier suppression hearing and found him subject to a two-level enhancement for obstruction of justice. We directed that the Probation Office prepare a memorandum to supplement the presentence report with regard to the issues of the quantity of drugs attributable to each defendant. We set a final sentencing hearing for January 3, 1996. However, this hearing had to be continued because of Defendant Officer Blount's *pro se* motion to withdraw his guilty plea.

## II. FINDINGS AND DISCUSSION RE SENTENCING

### A. 1000 Feet from School.

Defendants are charged with a violation of 21 U.S.C. § 860, distribution of drugs near a school. Specifically, the statute prohibits "distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising [a school, playground, etc.]." The relevant distance is between the actual point of possession and the school property line, not the shortest distance between the two relevant property lines. *See U.S. v. Haynes*, 881 F.2d 586, 591 (8th Cir.1989), *cert. denied*, 506 U.S. 898, 113 S.Ct. 279, 121 L.Ed.2d 206 (1992). The distance is measured "as the crow flies" and not as a pedestrian would walk. *U.S. v. Johnson*, 46 F.3d 1166, 1169 (D.C.Cir.1995). *See also U.S. v. Clavis*, 956 F.2d 1079, 1088 (11th Cir.1992), *cert. denied*, 504 U.S. 990, 112 S.Ct. 2979, 119 L.Ed.2d 597 (1992) and 507 U.S. 998, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993) ("[T]he statutory distance must be measured by a straight line method rather than a pedestrian travel route"); *U.S. v. Watson*, 887 F.2d 980, 980–81 (9th Cir.1989) (adopting a method other than "as the crow flies" would create uncertainty in the statute, generate needless debate, and thwart statute's purpose of creating "a readily ascertainable zone of protection."); *U.S. v. Ofarril*, 779 F.2d 791, 792 (2d Cir.1985) (per curiam), *cert. denied*, 475 U.S. 1029, 106 S.Ct. 1231, 89 L.Ed.2d 340 (1986) (measuring distance by pedestrian route rather than by straight line would be "a tortuous reading [that] would violate the plain meaning of the statute."); *U.S. v. Robles*, 814 F.Supp. 1249, 1251 (E.D.Pa.), *aff'd* 8 F.3d 813 and 8 F.3d 814 (1993); and *U.S. v. Rodriguez*, 961 F.2d 1089, 1095 (3d Cir.1992) ("schoolyard statute applies to a defendant who possesses drugs within 1000 feet of a school with the intent to distribute those drugs at *any* location") (emphasis added).

At the sentencing hearing on August 23, 1995, we heard testimony that Pod 2C of the new Lehigh County Prison is located within 1000 feet of the Allentown Central Catholic High School parking lot, a lot that was used for school activities. We also heard

testimony that the entire old jail facility[3] was within 1000 feet of a building used by Lehigh County Community College, a school of higher education. The government also pointed out that distribution activity relating to placing drugs into Officer Blount and Officer Torok's vehicles occurred in the home of Ms. Theresa Cordero, at 408 Chestnut Street, Allentown, Pennsylvania. At the August 23 hearing it was shown that 408 Chestnut Street is within 1000 feet of the Allentown Central Catholic High School building itself. In light of this testimony, we concluded that Officer Blount and Officer Torok were both subject to the two point enhancement for violating 21 U.S.C. § 860. We found little merit in Defendants' argument that because it was not proven that any class or other school activity was actually held on the specific portion of the school's parking lot that falls within the 1000 foot line, Defendants should therefore not be found in violation of the statute. The aim of the statute is to create an absolute zone of safety where drug activity should never occur. It would be inappropriate for us to amend or second guess the statute's plain language which clearly mandates the two-point enhancement.

## B. Acceptance of Responsibility.

With respect to Officer Torok, the Government sought a two-point enhancement for obstruction of justice and asserted that Defendant does not warrant a reduction for acceptance of responsibility. On November 30, 1995, we adopted paragraph 66 of the Presentence Investigation recounting Officer Torok's statements at his suppression hearing on pretrial motions of May 4, 1995. Specifically, we determined that those statements—made under oath and alleging that the arresting case agents directed Officer Torok what to say at the time of his arrest— amounted to perjury. We found that a two-level enhancement for obstruction of justice was therefore warranted.

■■■■ With respect to acceptance of responsibility, we considered, among other things, a letter dated July 27, 1995, submit-

ted through defense counsel, of Officer Torok's version of his offense. In that letter, Officer Torok claimed: not to have known the contents of the package Mr. Krause asked him to bring into the prison; not to have been willing to bring alcohol into the jail (although later succumbing due to threats to damage his vehicle); and to have felt intimidated by Pernell Riddick Sr. into bringing a package into the jail. Officer Torok summarily denied his involvement "in the whole conspiracy of bringing drugs into the prison." On November 30, 1995, we adopted the testimony of Douglas Krause and Theresa Cordero detailing Officer Torok's extensive involvement in smuggling drugs into the prison. We explicitly found further that Officer Torok had not truthfully provided to the Government all information necessary to limit applicability of a statutory minimum pursuant to U.S.S.G. § 5C1.2, assuming it became relevant. We now fully adopt paragraphs 67–73 from the Probation Office's Presentence Report which clearly show Officer Torok's version of the offense he committed is not comparable to the involvement outlined by Theresa Cordero and Douglas Krause. Paragraph numbers 72 and 73 state in their entirety:

Section 3E1.1(a) of the Guidelines allows for a two-point reduction in the offense level if the defendant clearly accepts personal responsibility for his offense. Section 3E1.1(b) states, "If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant assisted in the investigation or prosecution of his own misconduct by taking one or more of the following steps: (1) timely providing information to the government concerning his own involvement in the offense: or (2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently, decrease the offense level by one additional level."

---

3. The inmates of Lehigh County Prison were transferred from its old facility to its new and present facility from April 27 through May 1,

1992. The drug conspiracy headed by Charles Pernell Riddick, Sr. and Charles Pernell Riddick, Jr. operated in both facilities.

Despite the defendant's statement, pursuant to Application Note 1(a) of § 3E1.1 of the guidelines, since the defendant may have perjured himself at his pretrial suppression hearing on May 4, 1995, the defendant did not truthfully admit his conduct comprising the offense of conviction and did falsely deny relevant conduct for which he is accountable. Further, pursuant to Application Note 4, § E1.1, "conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct". Finally, the defendant pled guilty on May 8, 1995, in open court while the jury for his trial was being selected. Based on these factors, specifically, the defendant's obstructive behavior, the probation department has found that the defendant is not entitled to a reduction for acceptance of responsibility.

We therefore conclude that Officer Torok has in no significant way accepted responsibility for his pervasive role in the Riddick's drug-smuggling conspiracy. Defense counsel for Officer Torok argues that finding Officer Torok not qualified for a two-point reduction for acceptance of responsibility and yet qualified for a two-point enhancement for obstruction of justice amounts to double counting by the Court. We agree with the government's position at sentencing on November 30, 1995, that this is precisely what the guidelines—by maintaining separate but overlapping categories—require. *See U.S. v. Scurlock*, 52 F.3d 531, 540 (5th Cir.1995), *cert. denied*, —— U.S. ——, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994) (each enhancement targets different aspects of a defendant's behavior); *U.S. v. Jackson*, 25 F.3d 327, 332 (6th Cir.1994) (where defendant is unable to demonstrate that he assisted the authorities, owned up to his criminal behavior, or otherwise accepted responsibili-

ty, he fails to carry his burden of proof entitling him to a sentence reduction).

▮ With regard to Officer Blount, On November 30, 1995, we accepted the testimony of Shannon Sicher and Nigel McFarlane which, in addition to their testimony at trial, detailed Officer Blount's extensive involvement in the conspiracy headed by the Riddicks. Both witnesses stated that Officer Blount was known among the inmates for bringing drugs into the prison. Ms. Sicher testified that Officer Blount was the officer on duty when she had screen room visits with Mr. Riddick. Ms. Sicher also testified she slipped drugs under the door to the utility closet during those visits where other inmates would be waiting to retrieve them. Also at the November 30 hearing, Mr. McFarlane detailed Officer Blount's specific efforts to deliver drugs to him from outside the prison. In comparing this testimony with the admissions made by Officer Blount, we concluded, in full agreement with the Probation Office's presentence report, that Officer Blount to date has revealed only a very small part of his participation in this drug conspiracy. We therefore found that, as with Officer Torok, no downward adjustment for acceptance of responsibility for Officer Blount was warranted.

### C. Time in Conspiracy.

▮ On November 30, we stated our tentative conclusion that Defendant Officer Blount's period in the conspiracy ran from March 1992 through March 1994. After thorough review of the tape transcript on which the government relied to attain the March 1992 starting date, we now adopt the more conservative October 1992 date as the beginning of Officer Blount's involvement in the conspiracy. This decision reflects our ambiguity as to the statement made in March 1992 by Riddick Sr. to his brother and including reference to "Pipe," Officer Blount's nickname.[4]

---

**4.** That statement, intercepted by wiretap, was made in apparent reference to difficulties Mr. Riddick was having in getting a particular shipment of drugs into the prison. In response to a question by Mr. Riddick Sr., Kenneth Riddick replied "Everybody's dealing with that motherfucker, Pipe, sorry-ass like a bitch." As did the Probation office in its addendum of December

15, we have some difficulty determining whether this statement indicates Mr. Blount was or was not as yet a member of the Riddick conspiracy. As we noted at the time this issue came up during the court hearing, the sentencing process has become so technical that a defendant can now profit by his own wrongs. The defendant is in effect saying that he could not have been a

On November 30, 1995, we found Defendant Officer Torok was involved in the drug conspiracy from September, 1991 through April, 1992. We reaffirm that finding here.

### D. Conspiracy—Drug Quantity.

■ From the moment we accepted Officer Torok and Officer Blount's guilty pleas, there has been little question that defendants are responsible for the amounts they personally brought in to the jail facility. The principal issue for sentencing purposes is the quantity of drugs to properly attribute to them from the overall drug conspiracy.

On August 22, 1995 at the sentencing hearing for inmate Charles Pernell Riddick Sr. and inmate Charles Pernell Riddick Jr., we adopted the probation office's report which explicitly found:

> The defendant was involved on a daily basis in smuggling and distributing cocaine and marijuana within the Prison from July, 1988 through March, 1994 (approximately 2,097 days). *It is conservatively estimated that during this time period, the defendant was involved with at least 3.5 grams cocaine and 14 grams of marijuana per day.* Accordingly, it is estimated that a total of 7.33 kilograms of cocaine, and 29.33 kilograms of marijuana can be attributed to the defendant as a result of his participation in the conspiracy.

Presentence Investigation Report for Charles Pernell Riddick, Sr., at 12 (emphasis added).

At the sentencing of inmates Charles Pernell Riddick, Sr. and Charles Pernell Riddick, Jr. on August 22, 1995, we stated:

> [T]he findings as to both Riddick, Sr. and Riddick, Jr. in the Pre–Sentence Reports are conservative estimates. I believe they are correct and I do adopt the findings of the probation officer in that regard and I of course, again, have also heard the trial

testimony and under *Collado,* I have made a searching inquiry as to rule under *Collado.* Nevertheless, it becomes necessary to make certain estimates. Conservative and reasonable estimates have been made, I believe, in this case by the probation officer and I adopt those as the findings of the Court.

On November 30, 1995, we directed the probation officer to revisit those quantities to see if they were or were not supportable in the case of Officer Blount and Officer Torok.[5]

On November 30, 1995, we also tentatively sided with the Government's position "that a prison guard, because of his unique status as a facilitator, can be responsible and would be responsible in a jointly undertaken criminal activity for those quantities that came in on the days that he was working during a period of time that he was a member of the conspiracy." The Probation Office was directed to recalculate the guideline sentencing range according to two additional methods: first, attributing to the guards the daily average from the time they became involved in the conspiracy until they ceased to be involved, regardless of whether they actually worked those days; and second, attributing to the guards the daily average for the conspiracy for the days they worked.

The Probation Office concluded in a December 15, 1995 addendum to the presentence report, that attributing the daily average[6] for every day of the guards involvement in the conspiracy resulted in a base offense level of 26 for Defendants Officer Torok and Officer Blount. If instead the attribution was based on the actual number of days the guards worked, the base offense level for Defendants Officer Torok and Officer Blount was still 26. In contrast, if only the amounts they personally brought into the prison or otherwise controlled were attributed to them,

member of the drug conspiracy at the time of this statement because he was busy bringing drugs in the prison for other drug conspiracies.

**5.** In its Addendum of December 15, 1995 the Probation Office stated "the Court ruled that during the overall conspiracy, 3.5 grams and 14 grams of marijuana were brought into the prison from a variety of sources." In point of fact, we reserved ruling on that final determination pending receipt of the Probation Office's addendum and a final sentencing hearing, then scheduled for January 3, 1996.

**6.** It should be clear that the drug amounts in question are *daily averages* and not totals. We now deem the Probation Office's December 15 addendum amended consistent with this clarification.

Defendants Officer Torok and Officer Blount would both receive a base offense level of 20.

At the sentencing hearing on November 30, 1995, attorney Donato argued that the government had proven amounts meriting a guideline sentencing of level 8 (zero to six months) for Officer Blount. This rationale would hold Officer Blount responsible solely for the amounts of drugs he personally brought into the Prison. Similarly, counsel for Officer Torok asserted that Mr. Torok should be held accountable solely for the two packages he personally delivered to inmate Charles Pernell Riddick, Sr. and the four packages he personally delivered to Douglas Krause.

As we explain in detail below, we are unpersuaded by this argument. Because we conclude that Corrections Officers Torok and Blount's role in the drug conspiracy was critical to its overall success, we hold them commensurately responsible for their co-conspirator's drug activities. That conspiracy, as determined by the Probation Office, brought an overall total of 7.33 kilograms of cocaine and 29.33 kilograms of marijuana into the Prison over a period of 2,097 days, or a daily average of 3.5 grams of cocaine and 14 grams of marijuana per day. See Presentence Investigation Report for Charles Pernell Riddick, Sr., at 12. As we explain thoroughly below, we find Officers Torok and Blount responsible as full members of the conspiracy for that same daily average during their lesser period of involvement in the conspiracy.

In their Memorandum Regarding Relevant Conduct, filed December 15, 1995, Defendant Officers Torok and Blount argue that their failure to report the existence of drugs in the prison cannot seriously be argued to be the legal sine qua non to the life of the conspiracy. On the contrary, they argue, these drugs were entering from so many different points of entry involving so many different individuals that, in addition to the lack of a *legal* duty, there is no causative, "but for", connection. Again, we find this argument totally without merit. As we conclude below, it was precisely these Corrections Officers' involvement that allowed the conspiracy to survive and flourish. But for their failure to report

and put an end to the drug transactions occurring all around them—transactions they knew about and in which they personally participated—this conspiracy would have met an early and appropriate end.

The Sentencing Guidelines direct sentencing courts to determine a defendant's base offense level by considering:

> in the case of a jointly-undertaken criminal activity a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy, all reasonably foreseeable acts and omissions of others in furtherance of the jointly-undertaken criminal activity, that occurred in the commission of the offensive conviction, in preparation for that offense *or in the course of attempting to avoid detection or responsibility for that offense.* (emphasis added).

U.S.S.G. § 1B1.3(a)(1)(B). The Third Circuit has recognized, "the provision directs the sentencing court to include in the base offense level certain amounts *in addition to* those amounts the defendant was convicted of distributing." *U.S. v. Collado,* 975 F.2d 985, 990 (3d Cir.1992) (emphasis in original).

The standards for accomplice attribution at sentencing are different than those for determination of complicity in the conspiracy itself. As the *Collado* court stated:

> Specifically, the note instructs courts to assess accomplice attribution by determining whether the co-conspirator's conduct was "in furtherance of the ... *jointly undertaken ... activity*" (as opposed to the conspiracy as described in the count of conviction), *"within the scope of the defendant's agreement,"* and "reasonably foreseeable in connection with the criminal activity *the defendant agreed to undertake."*

*Collado,* 975 F.2d at 991 (emphasis in original). *See also, U.S. v. Scurlock,* 52 F.3d 531, 539 (5th Cir.1995); *U.S. v. Irvin,* 2 F.3d 72, 75 (4th Cir.1993), *cert. denied,* 510 U.S. 1125, 114 S.Ct. 1086, 127 L.Ed.2d 401 (1994); *U.S. v. Becerra,* 992 F.2d 960, 966 (9th Cir.1993) (under guidelines, each conspirator may be sentenced only for the quantity of drugs that he reasonably foresaw would be distributed or that fell within the scope of his own agree-

ment with the coconspirators); *U.S. v. Gilliam*, 987 F.2d 1009, 1012 (4th Cir.1993); *U.S. v. Jones*, 965 F.2d 1507, 1517 (8th Cir. 1992), *cert. denied*, 506 U.S. 924, 113 S.Ct. 346, 121 L.Ed.2d 261 (1992). The *Collado* court concluded:

> [W]hether a particular defendant may be held accountable for amounts of drugs involved in transactions conducted by a coconspirator depends upon the degree of the defendant's involvement in the conspiracy and, of course, reasonable foreseeability with respect to the conduct of others within the conspiracy.

*Collado*, 975 F.2d at 992. The Third Circuit provides sentencing courts with clear directions concerning how to conduct the proper analysis.

> [I]t is not enough to merely determine that the defendant's criminal activity was substantial. Rather, a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendant's sentence accurately reflects his or her role.

*Collado*, 975 F.2d at 995. *See also U.S. v. Conkins*, 9 F.3d 1377, 1387 (9th Cir.1993);

We are faced with a difficult determination. As we stated previously on August 22, 1995 at the sentencing for the Riddicks, "[D]rug organizations do not follow the organizational charts of the American Management Association." We can not simply determine the Defendants' ranks in the distribution organization by their titles and calculate attribution accordingly. We have received testimony as to Defendants involvement in the Riddick's conspiracy. Specifically we have the testimony of Douglas Krause concerning Officer Torok's agreement to prevent discovery of contraband in the event Krause's cell was searched. Similarly, with respect to Officer Blount, we have the testimony of Shannon Sicher that Officer Blount was on duty during several of the occasions she slipped drugs under the door of the screen visit room, to be picked up by other members of Mr. Riddick's organization.

We are ever-mindful of our obligation to conduct a searching inquiry under *U.S. v. Collado*. As the *Collado* court itself recognized, it becomes necessary to make certain estimates. *See also, U.S. v. Paulino*, 996 F.2d 1541, 1545 (3d Cir.1993), *cert. denied*, 510 U.S. 968, 114 S.Ct. 449, 126 L.Ed.2d 382 (1993), (recognition of the need to estimate is not a license to calculate by guesswork. Sentencing court must carefully scrutinize government's proof).

On August 22, 1995, We adopted the probation officer's "conservative and reasonable estimates" for the amounts of drugs coming in to the jail facility on a daily basis as 3.5 grams of cocaine and 14 grams of marijuana per day. We conclude that the most sensible and logical method of calculating the quantities for which Defendants Officer Blount and Officer Torok are to be held accountable is to multiply the daily average by the time period of their involvement in the conspiracy. This is done in recognition of our conclusion, discussed below, that the role played by Defendants Officer Blount and Officer Torok was more than incidental. Rather, it was crucial to the very existence and survival of the conspiracy. As the *Collado* court concluded:

> We recognize that in calculating the amounts in drug transactions, some degree of estimation must be permitted, for the government usually cannot seize and measure all the drugs that flow through a large drug distribution conspiracy. This is not to say that the calculations of drug amounts may be based on mere speculation, however. Given the dramatic effect such estimates have on the defendant's sentence, the sentencing court must carefully review the government's submissions to ensure that its estimates are proven by a preponderance of the evidence.

*U.S. v. Collado*, 975 F.2d 985, at 998.

Defendant Officer Joseph Torok jointly undertook to perform at least two important roles in the drug conspiracy: (1) to personally smuggle drugs and drug paraphernalia into the Prison on a regular basis; and (2) to help conceal and protect the conspiracy by violating his duties as a correctional officer by helping inmates such as Krause to avoid discovery of contraband and by not reporting

his own and others' drug trafficking to prison authorities, as he was required to do.

The trial testimony shows that Officer Torok smuggled drugs into the Prison regularly from September, 1991 through April, 1992. As would be expected in a unique environment such as a prison, Officer Torok's reputation for drug smuggling was well known among inmates. By early January of 1992, inmate Ronald Martin told inmate Douglas Krause that Officer Torok was "the guy that brings the drugs in." In late December or early January of 1992, inmate Ronald Martin told Douglas Krause that Officer Torok would smuggle drugs in for prisoners. Krause then told Officer Torok that Krause had heard of Torok's drug smuggling reputation:

> So I went and talked to Joe Torok about it. I asked him, I said that, you know, I've been around a little bit and I heard that he'll bring a package of drugs in for a certain amount. You know, I didn't mention no price at the time, but he said, "Yeah, I'll do that." And I said, "Well, what'll it cost me, $50," I asked him. And he said, "No, I can't even buy my kids sneakers for $50."

Testimony of Douglas Krause, May 23, 1995.

We conclude this shows that Officer Torok had direct knowledge that his drug-smuggling reputation was spreading within the Prison, and that inmates such as Krause were encouraged to smuggle drugs because of the general knowledge that Officer Torok was involved. Officer Torok's price of $100 per package, indicated that he knew the "going price"[7] and could insist on getting it. Theresa Cordero's testimony similarly shows that Officer Torok smuggled drugs on a regular basis. Cordero's estimated 15–30 deliveries to a guard's vehicle during February–April of 1992, at Defendant Officer Torok's

direction. We find these deliveries are attributable to Officer Torok.[8]

Furthermore, Shannon Sicher testified at the November 30, 1995 hearing that Riddick Sr. called Officer Torok one of his "boys," and his "roaddogs." This is yet another sign of the depth of Officer Torok's involvement in Riddick Sr.'s ongoing operation.

We similarly find that Officer Blount jointly undertook to perform at least three important roles in the distribution conspiracy: (1) to personally smuggle drugs into the Prison on a regular basis; (2) to help inmates and others bring drugs into the prison during both contact visits and "screen" visits; and (3) to help conceal and protect the conspiracy by violating his duties as a correctional officer by not reporting his own and others' drug trafficking to Prison authorities.

Nigel McFarlane testified at trial and at sentencing on November 30, 1995 that he heard from several other inmates that Defendant Officer Blount would allow drugs to be passed during contact visits. Mr. McFarlane also testified he directly observed Officer Blount allowing inmates free reign to receive drugs during visits and to bring drugs up to the pod. When Mr. McFarlane arranged, (through DEA supervision) to have Officer Blount smuggle some drugs into the prison for him, Officer Blount readily agreed to do so, showing that he was well accustomed to such transactions. On May 5, 1993, Officer Blount delivered the package of drugs to McFarlane's cell, according to their agreement. The delivery took place in broad daylight and after Officer Blount's shift. Officer Blount's casual attitude about delivering a drug package in such a conspicuous manner shows that he was well accustomed to making such deliveries.

---

7. Officer Blount also charged $100 per drug package.

8. Officer Torok claims that these deliveries cannot be connected to him because there is no proof that he owned a "truck" or a four-by-four. However Douglas Krause testified that Officer Torok personally instructed Krause to have drug packages placed inside a truck, and gave Krause the license plate. At the hearing on November 30, 1995, Teresa Cordero claimed she placed

drugs in a dark color four-by-four, off-road vehicle of some sort. We find that whether the vehicle was a truck or not, or even owned by Officer Torok or not, is irrelevant. Cordero and Krause had the drugs placed in a vehicle designated by Officer Torok. Officer Torok had access to this vehicle, whether he owned it or not, and used it as a drop-off location for drug packages.

Signs of daily drug use by inmates were obvious on the tiers in the old prison but were ignored by Officer Blount. As Nigel McFarlane observed, the inmates in the new jail's pod 2C "would just party. There would be a lot of drug smoking, a lot of cocaine and [other drugs]." It is no coincidence that pod 2C became known as the pod "where the drugs are," and that Officer Blount was a frequent visitor to it. Douglas Krause requested a transfer to pod 2C in December of 1992 because of its established reputation for drug availability. Officer Blount must have seen the drug use occurring around him, and must have realized that Riddick Sr.'s operation, which he protected through his silence, extended far beyond Officer Blount's own deliveries.

Officer Blount's activities had a ripple effect throughout the prison. Shannon Sicher testified that Riddick Sr. persuaded her to begin smuggling drugs through the screen visit room by assuring her that Officer Blount would be there and Riddick Sr. "had this under control." Riddick Sr. called Officer Blount one of "his people." Riddick Sr.'s scheme to bring drugs through the screen visit room required Officer Blount to unlock the adjoining utility room and to let certain inmates enter the room at the moment that Riddick Sr. had his screen visit. These transactions required close coordination between Officer Blount and other inmates. Moreover, other inmates who were not directly involved in the transaction could see it happening.

The screen visit room would not have become an avenue for drug distribution without Officer Blount. Officer Blount opened up this new drug route, bypassing even the most careful restrictions placed on outside visitors. The screen visit room was designed to allow visits between "high risk" inmates and "high risk" visitors, such as persons with prior criminal convictions, while preventing precisely the kind of criminal activity that Officer Blount made possible. By showing that Riddick Sr. could defeat the most restrictive conditions, Officer Blount undoubtedly enhanced Riddick Sr.'s power within the inmate population.

Officer Blount and Officer Torok knew that Riddick Sr.'s operation involved far more than their own deliveries, but nevertheless participated in it. Their silence was far from passive; it shouted defiance of all Prison rules, actively encouraged the inmates to engage in drug transactions, and undermined their respect for other correctional staff. The volume and daily nature of Riddick Sr.'s drug trafficking was clearly known to Officer Blount and Officer Torok, who could see with their own eyes the daily drug use in the pods, and who knew the quantity of a typical delivery from participating in such deliveries. Officer Torok's and Officer Blount's assistance to Riddick Sr. contributed to Riddick Sr.'s image among the inmates and outside associates as being the man in the Prison who "called the shots."

Officers Torok and Blount knew that word of their activities with Riddick Sr. would spread among the inmates. Officer Torok knew that he had a reputation among inmates for drug smuggling because Douglas Krause told him about it directly. Officer Torok should have reasonably foreseen that Riddick Sr. would use Torok's name to enhance Riddick's own reputation for having the means to get drugs into the Prison.

Throughout the time that Officer Blount and Officer Torok were employed as correctional officers, they had an affirmative duty, as the Prison's eyes and ears, to take all necessary steps to report and to prevent criminal activity inside the institution. Officers Torok and Blount argue they were under no criminal legal duty to report a conspiracy, but at most "a departmental duty which, if he failed or breached that duty, would result in his termination from employment, but nothing more."

■ We cannot agree. The breach by these officers amounted to more than a mere shirking of a moral duty. Although the defendants were not charged with misprision of a felony,[9] 18 U.S.C. § 4, the conduct of Offi-

---

9. 18 U.S.C. § 4 states "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals

and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, is

cer Torok and Officer Blount was sufficiently egregious as to amount to a violation of that statute. Defendants' attempt to diminish the significance of their failure to act is unpersuasive. The crime of misprision of felony contains four elements: (1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify the authorities; and (4) the defendant took an affirmative step to conceal the crime. *U.S. v. Ciambrone*, 750 F.2d 1416, 1417 (9th Cir. 1984). We conclude those four elements are clearly proven with respect to both defendants.

Prisons are filled with people who have a propensity to sell and use drugs. Given the availability of willing participants, it becomes clear that Officer Blount and Officer Torok's silence was in fact the single most important contribution to the open use of drugs and the large free-wheeling conspiracy which existed in this case.

Officer Torok and Officer Blount's unique status as prison guards charged with guarding the Riddicks and preventing the very conduct they took part in sheds light on what the scope of the agreement had to have been: i.e. an agreement without limitation and as large as the conspiracy itself. The guards were no longer in a position to stop other illegal drug usage and similar conduct by Mr. Riddick and other inmates for fear their own complicity in the conspiracy would be discovered. Mr. Riddick, on the other hand, needed the overall cooperation of the guards to carry on his activities freely inside the prison. Officer Blount and Officer Torok answered that need and in so doing betrayed the public trust. Their jointly undertaken shirking of duty reasonably and foreseeably allowed Mr. Riddick and other members of his conspiracy to step in and fully exploit the void they left.

As Lehigh County Prison Warden Edward Sweeney testified before us on November 30, 1995, correctional officers have a duty "to immediately report by way of institutional misconduct, all violations of rules and regulations." When asked what duty, if any, a correctional officer would have with respect to his knowledge that he, himself, had brought an illegal drug into the prison on behalf of an inmate, Warden Sweeney replied, "The act is illegal, it's against policy. If at some point thereafter he would make a wish to bring it to our attention, absolutely, he—he needs to do that ... the officer has an understanding that the illegal activity is still going on, he is allowing it to happen, so he does definitely have the responsibility to bring that to our attention." The Warden further testified to the effect that smuggling of illegal drugs into a prison by correctional officers has on the security of the facility:

[T]he security of the facility would—would, definitely, be compromised. The inmates' behavior when they're under the influence is—is very different than normal, they're less than rational, their behavior is more erratic. There's also a need when drugs are coming into the institution or other contraband, it—it facilitates power struggles which need to take place among the inmates, as far as who's coordinating distribution, there is definitely—leads to fights, assaults, extortion, collecting of funds from inmates who have purchased drugs or other contraband. So it leads to a lot of operational problems.

Question:

Now, let me ask you ... what effect, if any, it has with respect to the morale of the correctional staff itself, within the prison?

Answer:

Well, the individuals in question—as I understand it—convicted of bringing drugs into the institution. They were given a uniform, they were given a badge, they were entrusted by the public of Lehigh County, the taxpayers of Lehigh County to

guilty of the federal crime of misprision of felony."

Defendants argue in their Memorandum Regarding Relevant Conduct/Collado Issue that "[t]he guidelines impose no statutory duty to report illegal conduct on the part of a police

officer or prison guard." Their position fails to address our conclusion that the Defendants' behavior did amount to misprision of felony and is not to be deemed excusable because the guidelines fail to directly address it.

preserve the integrity of the prison system, uphold the law, uphold the policies of—and the rules of the prison and they betrayed that public trust by bringing the drugs in.

Testimony of Warden Edward Sweeney, November 30, 1995.

■ Even citizens without law enforcement duties are guilty of misprision of a felony when they witness a drug transaction and fail to report it. *See, e.g., U.S. v. Rosales,* 917 F.2d 1220 (9th Cir.1990) (passenger in truck guilty of misprision, responsible for entire amount of cocaine distributed by driver). Where, as here, individuals expressly charged with preventing criminal activity within the confines of an institution violate their law enforcement duties in order to avoid the conspiracy's detection, their role is an undertaking "as broad as the conspiracy itself." *U.S. v. Williamson,* 53 F.3d 1500, 1527 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995) (police officer who sold information to drug dealer responsible for total quantity of drugs distributed by the conspiracy). *See also U.S. v. Cruz,* 946 F.2d 122, 124–125 (11th Cir. 1991) (IRS Agent offered drug dealer investigative information; sentence properly based on entire amount of drugs involved in drug dealer's operation); *U.S. v. Narvaez,* 995 F.2d 759, 763 (7th Cir.1993) (Transit Authority ticket agent stole fares; sentence not restricted to amount defendant personally stole, but properly based on entire amount stolen by known coconspirators where Defendant was aware of the larger enterprise and continued to participate in it on an ongoing basis).

### E. Conclusion re Sentencing.

We can not help but conclude that in the pressure cooker of the jail situation, the corruption of prison guards significantly undermined the security of the Lehigh County Prison facility while greatly contributing to the overall success of the Riddick drug distribution conspiracy. That conspiracy devoted every waking moment to bringing in and forcing a captive audience to be exposed to the one danger from which they needed protection, the drugs that had put many of them in jail.

Our society demands respect for prison and its rules. "The public places a great deal of trust in correctional officers. They expect that the officers will not participate with inmates in schemes to violate the law." *U.S. v. Scurlock,* 52 F.3d 531, 541 (5th Cir. 1995). "It seems clear that criminal activity by an officer charged with enforcement of the law will diminish his respect in the eyes of the community, arouse cynicism, discourage public cooperation, and perhaps encourage crime by others." *Andrade v. City of Phoenix,* 692 F.2d 557, 559 (9th Cir.1982). An appropriate sentence is necessary to drive home the message that the courts will not tolerate that type of disrespect of the prison, the badge and the law. We believe that no upward departure as urged by the government is necessary at this point because our rulings with regard to drug quantity have adequately addressed our concerns about the defendants' conduct within the framework of the sentencing guidelines. We deem all other outstanding objections resolved consistent with the foregoing opinion.

### III. DISCUSSION RE GUILTY PLEA WITHDRAWAL

Officer Blount wrote a letter to the Court on December 17, 1995, prior to his final sentencing date of January 3, 1996.

In that letter he claims his lawyer, Arthur T. Donato, was ineffective and that he now wishes to withdraw his guilty plea. We had the letter filed and copies sent to all counsel. Mr. Donato requested a conference on the record, which was held on December 26, 1995, along with counsel for the United States. We appointed new counsel for Officer Blount, and immediately scheduled a hearing on Officer Blount's request to withdraw his plea.[10] At the end of the hearing, we denied Officer Blount's motion.

---

**10.** During the conference, attorney Donato stated that he had no advance notice of the defendant's *pro se* motion and was therefore away from his office during the conference and would probably have to withdraw from the matter. While these issues came before us on the eve of sentencing and were inconvenient for that reason, we nevertheless indicated to Mr. Donato that we found his

In order to prevail in an ineffective assistance of counsel claim, defendant must first establish that his counsel's performance fell below an objective standard of reasonableness. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Senk v. Zimmerman*, 886 F.2d 611, 614 (3d Cir.1989), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 756, 107 L.Ed.2d 772 (1990).

If defendant is able to show a deficiency in the conduct of his attorney, he must then also show that his counsel's deficient performance prejudiced him. *Id.* at 687, 104 S.Ct. at 2064; *Senk*, 886 F.2d at 614. To establish prejudice, defendant must show that *specific acts* or omissions of his counsel were "outside the range of professionally competent assistance." *Gardner v. Ponte*, 817 F.2d 183, 187 (1st Cir.1987), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 134 (1987).

▆▆▆▆ Federal Rule of Criminal Procedure 32(e) provides, in pertinent part: "If a motion to withdraw of a plea of guilty or nolo contendere is made before sentence is imposed, the court may permit the plea to be withdrawn if the defendant shows any fair and just reason." A criminal defendant has no absolute right to withdraw a guilty plea under this rule. *See U.S. v. Martinez*, 785 F.2d 111, 113 (3d Cir.1986). The *Martinez* Court evaluated the motion for withdrawal of a guilty plea under Rule 32 by looking to three factors: "(1) whether the defendant asserts his innocence; (2) whether the government would be prejudiced by withdrawal; and (3) the strength of the defendant's reasons for moving to withdraw." *Id.*, at 114. "The government is not required to show prejudice when a defendant has shown no sufficient grounds for permitting withdrawal of a plea." *Id.*, at 116. Rather, a motion to withdraw a guilty plea can be granted before sentencing only upon an affirmative showing of a "fair and just reason" as mandated by Fed.R.Crim.P. 32(e). *See U.S. v. Parrilla-Tirado*, 22 F.3d 368, 371 (1st Cir.1994).

▆▆ In his letter of December 17, 1995, Officer Blount initially asserted that his indictment failed to state an offense cognizable under 21 U.S.C. § 846 because it claimed Officer Blount smuggled "cigarettes" into Lehigh County Prison, not a federal offense. Officer Blount further claimed that because his attorney nonetheless urged him to plead guilty to the indictment, he received ineffective assistance of counsel in violation of Constitutional mandate. The hearing to address Officer Blount's *pro se* motion was held as scheduled on January 3, 1996.

Before calling any witnesses, counsel for Officer Blount indicated that with his client's approval, he was now withdrawing Officer Blount's claims that the indictment failed to state an offense, and that he was modifying the other ground presented by Officer Blount in the *pro se* motion. Counsel explained that this modification made it clear that what Officer Blount had really meant to assert was that he had failed to understand the elements of conspiracy at the time of his plea. Each side called only one witness. The defense called Officer Blount and the government called Attorney Donato.

The testimony of Mr. Blount on direct examination asserted that notwithstanding his statements under oath during our lengthy guilty plea colloquy and numerous meetings with his attorney Mr. Donato, he did not truly understand the law of conspiracy until he did his own legal research and reviewed the written opinion in the case of *U.S. v. Townsend*, 924 F.2d 1385 (7th Cir.1991). He further asserted that he only dealt drugs with two people: Nigel McFarlane and Douglas Krause, and was unaware of any overall drug conspiracy and therefore could not be guilty of conspiracy as it is charged in Count One.

We have some difficulty in believing Officer Blount's assertions. We doubt that he understood the *Townsend* case or whatever

---

conduct in making such a last-minute motion to be proper under the circumstances. In the interests of time, we acted on the strength of the defendant's *pro se* motion and appointed new counsel. We continued the sentencings set for January 3, 1996 and instead scheduled a hearing on the defendant's *pro se* motion so we could

make the necessary determinations with regard to the merits of the motion. At the hearing on January 3, 1996, defendant's new counsel confirmed that the defendant wished to have new counsel appointed consistent with our ruling during the telephonic conference.

case he was referring to and this is borne out by the confusing nature of his *pro se* motion, the failure to cite any cases, and the need for counsel to modify the motion. On cross examination, he was contradictory, evasive and at times deliberately untruthful. He even went so far as to now claim that he did not know what was going on during his guilty plea, that he did not know that inmate Riddick was bringing drugs into the prison, that he did not know what was going on in the prison because he was "high" on drugs and alcohol, and that he did not assist in the flow of drugs in the prison visitation areas.[11] These claims are absurd and are directly contradicted by our lengthy guilty plea colloquy as well as testimony of the witnesses and other evidence at the prior sentencing hearings.

We accepted a guilty plea from Defendant Officer Blount in open court on May 8, 1995. We conducted a painstakingly thorough colloquy. Officer Blount was told he was under oath and was instructed to stop the Court immediately if there was anything he did not understand. He was asked if he had had any drugs or alcohol on the day of the plea or the day before and he responded, "No, sir." He was then asked the following:

The Court: Can you hear me and understand me all right?

Defendant: Yes, sir.

Guilty Plea of Daniel Pernell Blount, May 8, 1995, Transcript at 13. We continued:

The Court: All right. Do you feel that you have had enough time to discuss this plea with your lawyer?

Defendant: Yes, sir.

The Court: All right. So far, has he done everything for you that you wanted him to do?

Defendant: Yes, sir.

The Court: Now, did anybody use force or threats to get you to enter this plea?

Defendant: No, sir.

The Court: All right. Are you doing this of your own free will—I mean, obviously, you're charged with a crime and that's—a factor, but other than, are you doing this of your own free will?

Defendant: Yes, sir.

The Court: All right. Did anybody tell you what to say today, what answers to give or did anybody put words in your mouth, so to speak?

Defendant: No, Sir.

Blount Guilty Plea Transcript, at 16–17.

At a later point, the government read a complete factual statement into the record in the defendant's presence:

With respect to Count 1 [conspiracy], your Honor, the Government's evidence would show at trial that at various times during the time that Mr. Blount was em-

11. Officer Blount further denied all involvement with the screen visit room scheme testified to at trial and at sentencing by Shannon Sicher. He stated he "can't remember how the visiting room screen is set up" and claimed he was not sure where Charles Pernell Riddick, Sr. was when those visits were taking place.

When asked directly and repeatedly whether he was working in Pod 2C near the screen visit room during screen visits that Riddick Sr. had with Shannon Sicher, Officer Blount said he didn't know and had never seen Shannon Sicher on a screen visit. Officer Blount further denied ever unlocking the utility room that is next to the screen visit room to let inmates in.

Officer Blount claimed Douglas Krause warned him about dealing with Riddick Sr. and not vice versa. Yet moments later when asked if Krause had talked to Blount about Krause's prior dealing with Riddick Sr., Officer Blount responded, "No, never."

Officer Blount admitted to bringing drugs to Nigel McFarlane one and "maybe three or four

times" to Douglas Krause. When asked whether he was testifying that he never brought drugs into Lehigh County Prison for any other inmates, Officer Blount responded "That's about right." When asked to elaborate, he said it was possible that he did because "There was times that I came in high and I don't remember." We asked, "What do you mean, you came in "high"? You came in high on drugs? Or on alcohol? Or—" Officer Blount answered, "Yeah, and alcohol."

When asked whether he ever was aware of drug use in the prison by inmates yet failed to report it, Officer Blount responded, "No, ma'am. I mean when the old jail was open, you could smell marijuana or something like marijuana in there, but I never smelled it on my pod." When asked where specifically he did smell marijuana, Officer Blount answered, "Throughout the jail. It was a—everyone smelled it. If one smelled, everyone smelled it." He then claimed he had reported the smell of marijuana "at times."

ployed as a guard at the Lehigh County Prison, a correctional officer, that he did bring quantities of cocaine and marijuana into that facility on behalf of several inmates, including defendants in this case, including but not limited to, Douglas Krause, Pernell Riddick, Charles Pernell Riddick, Sr., Charles Pernell Riddick, Jr., and other inmates including cooperating witness Nigel McFarlane.

The Government's evidence would also show that drugs which Mr. Blount brought into the prison and delivered directly to Douglas Krause were then redistributed to Charles Pernell Riddick, Sr., Charles Pernell Riddick, Jr. and other inmate associates which were part of the conspiracy during that time period; that Mr. Blount brought these controlled substances into the prison knowing that they were destined not only for the inmate to whom he directly distributed them, but that there would on occasion be redistribution to other inmates within the facility and that he did this knowingly and willingly, not by accident, coercion or mistake . . .

Guilty Plea of Defendant Blount, May 8, 1995, Transcript at 32.

The Court subsequently inquired whether the defendant fully admitted to the foregoing facts and Mr. Donato responded that the defendant "would admit to all of the facts with respect to Count One that the U.S. Attorney just related to the Court, with the exception of the element that he delivered directly to Pernell Riddick, Sr." Mr. Donato then asked if Mr. Blount agreed with that statement and he responded, "Right." Blount Guilty Plea, Transcript at 33.

Defendant's assertions are also contradicted by Attorney Donato's testimony at the January 3, 1996 hearing on the *pro se* motion. He testified that he carefully explained the law of conspiracy to Officer Blount on numerous occasions prior to sentencing, and that he properly explained the law again during the sentencing hearing. Mr. Donato testified that when Officer Blount first consulted him he denied any involvement in the drug conspiracy. As discovery materials became available, Attorney Donato confronted Officer Blount with these materials and Officer Blount changed his story and began admitting his involvement. Our own explanation to Officer Blount at the time of his guilty plea on May 8, 1995 of the elements of conspiracy was as follows:

The Court: Okay. Now, at this point, I want to explain a little bit about the elements of the offenses that you're pleading to. Now, in Count 1, you're pleading to conspiracy, okay?

Defendant: Yes, sir.

The Court: Conspiracy is a kind of a hard thing to understand, but it consists of two people—two or more people entering into an agreement to either do something that's illegal or to do something that is legal, but to do it by illegal means. Do you understand what I just said?

Defendant: Yes, sir.

The Court: So—all right. And in this case, the Government would have to prove beyond a reasonable doubt that the conspiracy charged in the indictment was willfully formed and existed at or about the time alleged and that you willfully joined the conspiracy, that is you did it knowingly, you did it intentionally, you joined into it, that you didn't join in by accident or for some innocent reason. Do you understand that?

Defendant: That I didn't join in it by accident?

The Court: By accident, yes.

Defendant: Could I talk with him?

The Court: Sure. Let me give you an example first and then I'll let you talk to him, let me give you an example of how that would work. Suppose you and I had an agreement to rob a bank—

Defendant: Just me and you?

The Court: Me and you, right.

Defendant: Right.

The Court: Are you with me so far?

Defendant: Yeah.

The Court: And we're getting ready to rob the bank, okay?

Defendant: Yes, sir. Yes, sir.

The Court: Now, your lawyer comes along and he sees us walking down the street

towards the bank with the guns and everything and he says, you guys gonna rob the bank? We say, yeah. He says, need some help? We say, sure. He would then be a part of that conspiracy.

Defendant: Okay, sir, but—

The Court: Do you follow me?

Defendant: Yes, sir, but—

The Court: Now I'm going to—

Defendant: —I would have to know about this—all three of us would have to know about it together, right?

The Court: Right. Basically, you would—now you don't have to know everything about it, you don't have to know—

Defendant: Just that the—

The Court: —you don't have to know every—all of the elements about it, but you have to know that you know what you're getting into. Do you follow me?

Defendant: The three of us would have to know though?

Donato: The question he's asking the Court, your Honor—

The Court: Yes.

Donato: —if I may interrupt?

The Court: Sure.

Donato: Is whether or not he would have to know everyone who was in the conspiracy.

The Court: Yeah. You don't have to know everyone that's in it. Do you follow me?

Defendant: But at least two other people would have to know about?

The Court: You would have to know that a conspiracy existed. You would have to know that there was an agreement between at least two people and the general nature of the conspiracy. As the courts have put it—and let me give you their exact language, the courts have said in that regard with regard to a conspiracy: That you can become a member of a conspiracy without full knowledge of all of the details of the conspiracy.

So you might not know all—you might know—not know where—if we're going to rob a bank, you know, he might not know exactly what we're going to do

with the money, he might not know who's driving the get-away car, he might not know all of the details, but he's got to know enough—see, your role can be minor, but you must at least have some knowledge. Do you follow me?

Defendant: Yes, sir.

The Court: Now, I'll let you—you can talk to your lawyer, if you've got any further questions, maybe he can answer them for you.

(Discussion held off the record.)

The Court: Do you understand it?

Defendant: Yes, sir.

The Court: Okay.

Donato: Well, your Honor, I think the record should—if I—

The Court: Yeah.

Donato: The record should reflect that the question that Mr. Blount has with respect to the law of conspiracy is one that we've discussed numerous times and it centers around the issue of whether or not—in order to be guilty of a conspiracy—whether or not an individual has to know all of the participants or whether or not dealing with one or two of the participants is enough to satisfy that element of the crime.

And I've advised him that dealing with one or two of the participants of the conspiracy and knowing generally that the two participants with whom he dealt, were doing something illegal—that is bringing drugs into the jail—would be enough to put him into the conspiracy. And the Government would not be required to prove beyond a reasonable doubt that he actually knew who else those two people with whom he dealt, were dealing with.

The Court: Do you understand that?

Defendant: Yes, sir.

The Court: It is enough if you—with an understanding of the unlawful character of conspiracy—knowingly request, encourage, advise, aid or assist in furthering the plan.

Defendant: Okay.

The Court: Okay?

Defendant: Yes, sir.

Guilty Plea of Daniel Blount, May 8, 1995. Transcript at 26–31.

Defense counsel has ignored all of the above language with the exception of one small part of the remarks of Attorney Donato on page 30 which he attempts to take out of context. The argument is made that Mr. Donato's remark could be taken to imply that Officer Blount could be guilty of conspiracy even if he only dealt with two people who were bringing drugs into the prison for their own personal use. This is not the meaning of the language which related to "bringing drugs into the jail" for redistribution to others. This is borne out by the following sentence in which Attorney Donato indicates that Officer Blount could be a member of a conspiracy without the government proving "that he actually knew who else those two people with whom he dealt, were dealing with." This meaning is the only one which is consistent with our lengthy and detailed explanation which the defendant said he understood.

Moreover, the defendant has not made the necessary assertions of innocence to support his *pro se* motion to withdraw his guilty plea. On the contrary, he has admitted that he was bringing drugs into the prison. He also admitted this to his attorney, and admitted it again while testifying at the January 3, 1996 hearing. He further admitted, albeit grudgingly, that believed "what everyone was saying, Pernell was getting drugs in the prison." He claimed that guards, including lieutenants and sergeants knew this but specifically denied inmates ever had told him of Riddick's activities. Yet only moments later, when asked whether he was aware that Riddick Sr. was having drugs brought into Lehigh County Prison on a daily basis, Officer Blount claimed he was not. Officer Blount's flip-flopping on the most basic questions of his involvement in the drug conspiracy convince us he is still attempting to conceal a great deal. The evidence of his guilt is overwhelming, including lengthy testimony and numerous tape recorded conversations.

We can not help but note that the defendant's *pro se* motion on December 17, 1995, came shortly after we had tentatively ruled on November 30, 1995, that the government's position with regard to the attribution of drugs under *Collado* was correct. Defendant's *pro se* motion came immediately after the probation office issued a memorandum, on December 15, 1995, setting forth Officer Blount's guideline sentence for such a tentative ruling for which sentence was in a range of 97 to 121 months.

We cannot believe that defendant's seven-month delay in filing his *pro se* motion was prompted by detailed legal insights he somehow obtained in reading case law. Rather, even though the actual imposition of sentence has not yet taken place, there have been two sentencing hearings and sufficient information existed under the rigidity of the sentencing guidelines for Officer Blount to realize the likelihood that he would receive a substantial sentence. It is obvious that faced with this, he chose to file his *pro se* motion notwithstanding our explanation to him at the time of his guilty plea.

The Court: Okay. But once it's finally determined what the presentence report is, whether you agree with that or not, the plea is still binding on you, I want you to understand that, too.

Blount: Yes, sir.

The Court: You understand that?

Blount: Yes, sir.

Guilty Plea of Officer Blount, May 8, 1995, Transcript at 22.

■ Where a defendant understands in open court at the time of his plea that his guideline range could not be predicted but rather "directly related to the amount of controlled substance involved," he may not withdraw his guilty plea. *U.S. v. Young*, 981 F.2d 180, 184 (5th Cir.1992). At the time of the guilty plea, we informed the defendant as follows:

The Court: Do you understand that in a drug case—particularly a drug conspiracy case—drug amounts can have a significant effect on your guideline sentencing level and under some circumstances, you can be held responsible for the quantity of drugs which was possessed by others or in counts which are dismissed. Do you understand that?

738

Defendant: Yes, your Honor.

Guilty Plea of Defendant Blount, May 8, 1995, Transcript at 47.

 A defendant may not withdraw his plea simply because of his "fear of substantial sentence." *U.S. v. Jones,* 979 F.2d 317, 318 (3d Cir.1992). We believe it is just such a fear that inspired Officer Blount to make his *pro se* motion. Withdrawal of a guilty plea is a "privilege," not a right. *Kercheval v. U.S.,* 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927); *U.S. v. Trott,* 779 F.2d 912, 915 (3d Cir.1985) (citing *Government of Virgin Islands v. Berry,* 631 F.2d 214, 219–20 (3d Cir.1980)). We are well aware that the defendant had not been formally sentenced at the time of his *pro se* motion. Nevertheless, so much information had been developed that he could predict his probable sentence with some accuracy. We therefore find the case law pertaining to post-sentence motions to be informative. As the Third Circuit has clearly stated:

> Courts naturally look with a jaundiced eye upon any defendant who seeks to withdraw a guilty plea after sentencing on the ground that he expected a lighter sentence. Cases of disappointed but unfounded expectations must be carefully distinguished from those in which the record shows, when judged by objective standards, the defendant was reasonably justified in his mistaken impression of the possible consequences.

*U.S. v. Crusco,* 536 F.2d 21, 24 (3d Cir.1976). The District Court should deny a post-sentence motion to withdraw a plea unless manifest injustice will result. *Paradiso v. U.S.,* 482 F.2d 409, 416 (3d Cir.1973). A court may also consider whether withdrawal of the plea would substantially inconvenience the court and waste judicial resources. *U.S. v. Badger,* 925 F.2d 101, 104 (5th Cir.1991). In light of extensive testimony and other evidence showing Officer's complicity in the drug conspiracy, we do believe such a waste of resources would occur here.

A defendant's sworn colloquy before this court is not something we take lightly. The United States Supreme Court expressed its view of colloquies in the context of guilty pleas, in *Blackledge v. Allison,* 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). We there stated that "[s]olemn declarations in open court carry a presumption of verity." *Id.* at 74, 97 S.Ct. at 1629. Although these in-court declarations are not *per se* voluntary and intelligent, "[t]he subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Id.* (citing *Machibroda v. U.S.,* 368 U.S. 487, 495–96, 82 S.Ct. 510, 514, 7 L.Ed.2d 473 (1962); *Price v. Johnston,* 334 U.S. 266, 286–87, 68 S.Ct. 1049, 1060–61, 92 L.Ed. 1356 (1948)).

For the foregoing reasons, we denied Officer Blount's *pro se* motion. We also believe that the government would be prejudiced if we were to allow Officer Blount to withdraw his plea but we need not discuss this issue because defendant has not established a proper basis for withdrawing his plea.

An appropriate order follows.

### ORDER

AND NOW, this 8th day of January, 1996, the foregoing memorandum, the presentence report and all supplements thereto are hereby made a part of the record. It is further ordered that Daniel Pernell Blount's motion to withdraw his guilty plea, filed on December 26, 1995, is DENIED.